IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| FRANK SCHLISKE,<br><br>Plaintiff,<br><br>v.<br><br>ALBANY POLICE DEPARTMENT; JASON CARLILE,<br><br>Defendants. | Case No. 6:08-cv-6098-AA<br><br>**RESPONSE TO DEFENDANT CARLILE'S MOTIONS FOR SUMMARY JUDGMENT** |

Plaintiff Frank Schliske responds to Defendant Carlile"s Motions for Summary Judgment and opposition to Plaintiff's by:

1) The facts as stated and exhibited in Plaintiff's Complaint, as stated and exhibited in his Motions for Summary Judgment, and as stated in his attached affidavit.

2) Caselaw authority and legal argument as cited and argued in Plaintiff's Motions for Summary Judgment, his attached Memorandum in support of those Motions and opposing Mr. Carlilie's Motions for Summary Judgment.

In a nutshell, Defendant Carlile's "absolute immunity" argument is precluded as a matter of law; as is "qualified immunity" in that the nature of the allegations preclude it; so Mr. Carlile's only defense would be "truth"; that IN FACT there WAS a killing, Mr. Schliske is the killer and an investigation was continuing to find the victim's body; OR there was enough evidence in Mr. Carlile's hands to make a rational person believe that there was a

killing, Mr. Schliske is the killer, there is a victim's body out there somewhere; so a serious homicide investigation is continuing.

We have alleged that as a matter of fact this was NOT true, and nothing in the file or made available to us indicates otherwise. But if Mr. Carlile denies this, then this becomes an issue of disputed material fact and summary judgment is NOT appropriate and this case needs to move to the discovery phase.

For these reasons we ask the Court to deny Mr. Carlile's Motions for Summary Judgment.

Respectfully Submitted December 1 2008

*Frank Schliske*
541-924-0195

Pg 2 RESPONSE TO DEF CARLILES MOTIONS FOR SUMMARY JUDGMENT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| FRANK SCHLISKE,<br><br>   Plaintiff,<br><br>v.<br><br>ALBANY POLICE DEPARTMENT; JASON CARLILE,<br><br>   Defendants. | Case No. 6:08-cv-6098-AA<br><br>**AFFIDAVIT OF**<br><br>**FRANK SCHLISKE** |

I Frank Schliske being first duly sworn under oath hereby depose and state: I have never killed a human being. I have never been convicted of killing a human being. One year ago I was arrested and charged with killing Mr. David Sitton who was then and is now alive. This was error on the part of Albany Police Department and the Linn County DAs Office. When Mr. Sitton showed up alive December 04 2007 I was immediately charged with killing a "human being". This charge was dismissed six days later. This charge was error on the part of Linn County DAs Office.

To my knowledge during the last 12 months no in--vestigation into any alleged killing of such unknown being has taken place. Neither I nor any of my acquaintances has been further interviewed nor searched, nor has any related dead body been found nor searched for nor missing person named.

I cannot find a permanent home nor job because I am widely believed to be a killer based on people's under-

-standing of what has been said of me in the Albany Democrat Herald during early December 2007. These members of the public believe that despite dismissal of the charges against me it is just a matter of time before I am arrested and convicted for homicide, this belief based on the Dec 10 2007 comments to the Democrat Herald by Jason Carlile.

Respectfully Submitted December 1 2008

Frank Schliske

541-924-0195

Subscribed and Sworn to Before Me December 1st 2008

Notary for Oregon

OFFICIAL SEAL
GAYLE A HINZMAN
NOTARY PUBLIC - OREGON
COMMISSION NO. 420301
MY COMMISSION EXPIRES OCT. 14, 2011

Page 2 AFFIDAVIT OF FRANK SCHLISKE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| FRANK SCHLISKE,<br><br>　　Plaintiff,<br><br>v.<br><br>ALBANY POLICE DEPARTMENT; JASON CARLILE,<br><br>　　Defendants. | Case No. 6:08-cv-6098-AA<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTIONS FOR SUM--MARY JUDGMENT AND OPPOS--ING DEFENDANT CARLILE'S MO--TION FOR SUMMARY JUDGMENT** |

POINTS AND AUTHORITIES

Plaintiff Frank Schliske present's caselaw author--ity and logical argument to respond to Mr. Carlile's five defense arguments in order:

1) Absolute Immunity. Defendant Carlile over--states the availability of "absolute immunity" and presents caselaw not at point with the specific issues in dispute herein. The US Supreme Court and 9th US Circuit Court of Ap--peals have dealt with the specific issue of when a prose--cutor is entitled to absolute immunity and when he is not in a number of recent definitive 42 USC Section 1983 rul--ings directly at point to the case at hand:

Buckley v Fitzsimmons et al 509 US 259

*Held:* Respondents are not entitled to absolute immunity. Pp. 267-278.

(a) Certain immunities were so well established when § 1983 was enacted that this Court presumes that Congress would have specifically so provided had it wished to abolish them. Most public officials are entitled only to qualified immunity. However, sometimes their actions fit within a common-law tradition of absolute immunity. Whether they do is determined by the nature of the function performed, not the identity of the actor who performed it, *Forrester* v. *White*, 484 U. S. 219, 229, and it is available for conduct of prosecutors that is "intimately associated with the judicial phase of the criminal process." *Imbler* v. *Pachtman*, 424 U. S. 409, 430. Pp. 267-271.

(c) Fitzsimmons' statements to the media also are not entitled to absolute immunity. There was no common-law immunity for prosecutor's out-of-court statements to the press, and, under *Imbler*, such comments have no functional tie to the judicial process just because they are made by a prosecutor. Nor do policy considerations support extending absolute immunity to press statements, since this Court has no license to establish immunities from § 1983 actions in the interests of what it judges to be sound public policy, and since the presumption is that qualified, rather than absolute, immunity is sufficient to protect government officials in the exercise of their duties. Pp. 276-278.

Genzler v Langanbach 9th US Circuit (2004)

### III.  Discussion

[1] An official is protected by absolute immunity from liability for damages under § 1983 "when performing the traditional functions of an advocate." *Kalina v. Fletcher*, 522 U.S. 118, 125 (1997). Officials are entitled to qualified rather than absolute immunity, however, when they perform administrative or investigative functions. *Id.* at 126; *Burns v. Reed*, 500 U.S. 478, 494-96 (1991).

To determine whether an action is administrative, investigative or advocatory, we apply a "functional" analysis. *Burns*, 500 U.S. at 486. Official immunity depends on "the nature of the function performed, not the identity of the actor who performed it." *Kalina*, 522 U.S. 118 at 127 (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). Thus, "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley v. Fitzimmons*, 509 U.S. 259, 273 (1993).

[2] A government official's activity involves an advocacy function and is protected by absolute immunity only when that activity is "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976); *Kalina*, 522 U.S. at 125 (quoting *Imbler*); *Buckley*, 509 U.S. at 270 (same); *Burns*, 500 U.S. at 479 (same); *see also Milstein*, 257 F.3d at 1009 (prosecutorial immunity protects "the prosecutor's actions [that] are closely associated with the judicial process") (citing *Imbler*). Advocatory con-

duct by the prosecutor that is intimately associated with the judicial phase of the criminal process is sometimes called "quasi-judicial" conduct. *E.g., Broam v. Bogan*, 320 F.3d 1023, 1029 (9th Cir. 2003) ("[I]n deciding whether to accord a prosecutor immunity from a civil suit for damages, a court must first determine whether a prosecutor has performed a quasi-judicial function. If the action was part of the judicial process, the prosecutor is entitled to the protection of absolute immunity whether or not he or she violated the civil plaintiff's constitutional rights.") (citation and internal quotation marks omitted).

The Supreme Court has "been quite sparing in [its] recognition of absolute immunity, and ha[s] refused to extend it any further than its justification would warrant." *Burns*, 500 U.S. at 487 (citations and quotation marks omitted). In *Buckley*, the Supreme Court denied absolute immunity to prosecutors accused of holding a defamatory press conference — an activity which "had no functional tie to the judicial process." 509 U.S. at 277. The *Buckley* Court also denied absolute immunity to prosecutors who had fabricated evidence "during the early stage of the investigation" when "police officers and assistant prosecutors were performing essentially the same investigatory functions." *Id.* at 273. A prosecutor does not have absolute immunity for providing legal advice to police that probable cause exists to arrest a suspect, *Burns*, 500 U.S. at 491, or for personally attesting to the truth of evidence in support of charging documents. *Kalina*, 522 U.S. at 130.

The Supreme Court has consistently "emphasized that the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Id.* at 476. Further, "the presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Id.* at 477-78.

Goldstein v City of Long Beach et al 9th US Circuit March 28 2007. ↓

On the other hand, **prosecutors** do not have absolute immunity "for advising police officers during the investigative phase of a criminal case, performing acts which are generally considered functions of the police, acting prior to having probable cause to arrest, or making statements to the public concerning criminal proceedings." *Botello*, 413 F.3d at 976-77 (citing *Burns*, 500 U.S. at 493, and *Buckley*, 509 U.S. at 274-78). Nor do government officials have absolute immunity "for conduct involving termination, demotion and treatment of employees." *Id.* at 976 (citing *Forrester*, 484 U.S. at 228-30, and *Meek v. County of Riverside*, 183 F.3d 962, 967 (9th Cir. 1999)). For example, we have held that absolute immunity does not apply to a District Attorney's decisions to demote or fail to promote a deputy attorney, to reassign the deputy to a different department, or to bar the deputy from prosecuting any future murder cases. *Ceballos v. Garcetti*, 361 F.3d 1168, 1184 (9th Cir. 2004), *rev'd on other grounds*, 126 S. Ct. 1951 (2006). Unlike the removal of a deputy attorney from a particular case, which falls "within the District Attorney's prosecutorial function" because it is "intimately associated with the judicial phase of the criminal process," we determined that these challenged actions were "personnel decisions" falling "squarely within the District Attorney's administrative function. Even the decision not to reassign Ceballos to future murder cases was a personnel decision, and was unrelated to any particular prosecution or ongoing judicial proceeding." *Id.* (citing *Broam*, 320 F.3d at 1028).

In defense to an action for defamation, Oregon recognizes two forms privilege: absolute and qualified. <u>DeLong v. Yu Enterprises, Inc.</u>, 334 Or 166, 170, 47 P3d 8 (2002). The defense of qualified privilege can be overcome if the alleged defamatory statements were made in bad faith or with malice. *Id.* Absolute privilege, on the other hand, is a complete bar to a claim of defamation and precludes liability regardless of the defendant's state of the mind. *Wallulis v. Dymowski*, 323 Or 337, 347-48, 918 P2d 755 (1996).

Historically, Oregon has recognized absolute privilege for defamatory statements in only a handful of situations. *DeLong*, 334 Or at 170; *Wallulis*, 323 Or at 348-50.

Clearly, under established authoritative law Mr. Carlile is not entitled to "absolute immunity" in the case at hand.

2) Qualified Immunity. Mr. Carlile loses any claim to "Qualified Immunity" because he abuses the privilege for several reasons cited in Mr. Carlile's Memorandum in Support of Motion For Summary Judgment Page 5 (last paragraph, citing Lund v Arbonne International Inc 132 Or App 87, 96 (1994). ) → "The privilege may be lost if the speaker does not believe that the statement is true or lacks reasonable grounds to believe that it is true; if it is published for a purpose other than that for which the particular privilege is given; if the publication is made to some person not reasonably believed to be necessary to accomplish the purpose; or if the publication includes defamatory matter not reasonably believed to be necessary to accomplish the purpose."

We assert that Mr. Carlile's statements to the Albany Democrat Herald are knowingly or recklessly false; were made not to "inform" the public about a serious ongoing homicide investigation and search for the victims body, but to misinform the public to "save face" after a embarrassing police mistake; and that the publication did indeed include defamatory matter (the impression that Mr. Schliske is a killer) not reasonably believed to be necessary to accomplish the purpose of telling the public the truth about the Schliske/Sitton investigation/arrest.

The issue is this: Mr. Carlile as prosecutor has duties to the truth and to the public; if the Schliske/Sitton affair was just embarrassing error the public (including Mr. Schliske) have a right to be informed of this. See US v Berger below. ↓

BERGER V. UNITED STATES, 295 U. S. 78 (1935) -- US Supreme Court Cases

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the two-fold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused, when they should properly carry none.

Mr. Carlile was under no obligation to make the statements he did; he could have told the truth, apologized to Mr. Schliske and warned of the dangers of having faith in unsubstantiated "tips". Instead by his own personal choice, not duty to his job, he chose to defame Mr. Schliske and lie to the public about the alleged "continuing homicide investigation".

3) "Truth" of defamatory statements and 4) de--famatory meaning. . Plaintiff notes that in the 4 days prior to his arrest Albany Police utilized 18 police personnel in--cluding 5 detectives, interviewed 10 potential witnesses and conducted 4 searches. The day after Plaintiff's arrest the al--leged "victim" turned up at the police station alive. Then Mr. Carlile filed an amended "Information" charging Mr. Schliske with the death of an unnamed "human being". Six days later those charges were dismissed and Plaintiff was

released.

    This is an unusual situation. Usually police have a report or evidence of a crime then look for suspects. In this case they had a "suspect" and were trying to find evidence of a crime, in this case homicide. So they have made up their mind that Mr. Schliske killed someone, now they want to find the dead body of the alleged victim or any evidence tying Mr. Schliske to a killing. In a homicide investigation police invariably start with a dead body or missing person. When the first alleged victim turns up alive, they start look--ing for "another" victim? So when it is said that "this case is not closed", This is still a homicide investigation" Mr. Carlile is talking about a killing by Mr. Schliske; and when Mr. Carlile talks about "the victim" and the victim's body, he is talking about Mr. Schliske's "victim". So Mr. Carlile's statements to the Albany Democrat Herald clearly "concern" the Plaintiff, are about the Plaintiff in the context of being the ONLY suspect in a "homi cide investigation" that is "not closed" just not enough evidence to proceed" against Mr. Schliske. These statements also must be seen in the con--text of the four earlier Democrat Herald articles, one dis--playing color photos of Mr. Schliske as alleged killer and Mr. Sitton as his alleged victim.

    The December 10 2007 Democrat Herald article in dispute first explains that a manslaughter charge against Mr.

Schliske has just been dismissed because, according to Mr. Carlile, "we don't have enough evidence to proceed at this time". To "proceed at this time" means to hold Mr. Schliske on the charges while a conviction is sought. Evidence to seek such a conviction excludes the hearsay account of the tipster, excludes any polygraph exam result, even excludes any un--corroborated confession under Oregon law (and Mr. Schliske never confessed to a killing). And the allegedly "dead" victim turned up alive.

To say that there is not "enough" evidence to proceed implies that there is evidence, just not enough. In fact, this statement is false and misleading, as in fact there is NO evidence to proceed in obtaining a manslaughter conviction. NOTHING in the "Affidavit of Probable Cause" and no--thing offered since represents reliable admissible evidence that Mr. Schliske killed Mr. Sitton or anyone. Neither does Mr. Schliske's criminal history indicate such a propensity.

So Mr. Carlile should have told the Democrat Her--ald "we have NO evidence to proceed at this time".

Then Mr. Carlile explains that in the context of the "victim" turning up alive "This case is not closed. This is still a homicide investigation". But is this true? Police appear to have conducted no interviews, no searches, and clearly have come up with no "victim" either as a dead body

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

or missing person. Compare this with the police activity of early December 2007. So in what way is this case still a "homicide investigation?

We have alleged that any real good faith homicide investigation ended when Mr. Sitton showed up alive. This allegation has never been contested. If this has been the case then Mr. Carlile's statements to the Democrat Herald indicating that such an investigation is continuing is false and misleading.

Mr. Carlile then discusses that a victim's identity is not required for making the manslaughter charge but fails to state that in that case a body—"John or Jane Doe"—is required. In a "missing person" homicide investigation the identity of the victim is necessary. In fact, the last paragraph of the Democrat Herald article is just self serving commentary by Mr. Carlile to give the public the false impression that he and the police knew what they were doing in the Schliske case when they did not.

Not only are Mr. Carlile's statements capable of a defamatory meaning, when seen in context there is no other logical way to interpret them. Time has been the test of whether they were true or not; here it is a year later and there is no evidence that there has been a continuing homicide investigation and no evidence to support any belief that Mr. Schliske is a killer or that anyone is dead.

5) False Light/ Reckless disregard of truth.

ALL of Mr. Carlile's comments to the Albany Democrat Herald are by inference directed at Mr. Schliske to the effect that someone is dead and Mr. Schliske is the killer. They create the clear but false impression that it is just a matter of time before this "homicide investigation" gives them enough additional evidence to proceed with the manslaughter charges. That this false impression was sub--scribed to by the county DA and publicized to tens of thousands of local newspaper readers is a "text book" ex--ample of "invasion of privacy—false light".

So this all "boils down" to the following question of fact: Did Mr. Carlile give the impression that there were good reasons to believe that Mr. Schliske may have killed someone and that an investigation based on this fact was actively continuing; because at the time of the article:

a) There WERE good reasons to believe that Mr. Schliske DID kill someone and that an investigation <u>was</u> being actively continued; OR

b) There WERE NOT good reasons to believe Mr. Schliske had killed someone and in fact an active investigation WAS NOT continuing but Mr. Carlile made statements to the contrary KNOWING they were false and misleading or with reckless disregard of the falsity and misleading nature of the statements?

We allege b); if Mr. Carlile asserts a) this creates an issue of dispute of material fact and summary judgment would not be appropriate.

Respectfully Submitted December 1, 2008

*Frank Schliske*