IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


FRANK SCHLISKE,                                    Civ. No. 08-6098-AA

        Plaintiff,                                 OPINION AND ORDER

     v.

ALBANY POLICE DEPARTMENT,
JASON CARLILE, DAMON STRUBLE,
GLENN FAIRALL, STEVEN CORDER,
DAN JONES,

        Defendants.
_____

Aiken, Chief Judge:

     Plaintiff, appearing *pro se*, originally filed suit alleging
unlawful seizure, false arrest and imprisonment against the Albany
Police Department and defamation against prosecutor Jason Carlile.
After defendants sought summary judgment, the court granted
defendants' motion in part, dismissing plaintiff's defamation claim
and allowing plaintiff to amend his complaint to assert a claim of
unlawful seizure against individual defendants pursuant to 42
U.S.C. § 1983.  Plaintiff did so and realleged his state law claim
for false arrest.  Defendants again move for summary judgment.

1    - OPINION AND ORDER

BACKGROUND

On November 30, 2007, the Albany Police Department received a call from Kathy Leonard. Ms. Leonard reported that her brother, Scott Leonard, contacted her that morning and told her that plaintiff had confessed to killing "a pedophile by breaking his neck" the night before. Kathy Leonard also reported that her brother feared that plaintiff would harm or kill him. Albany Police Officer Damon Struble convinced Kathy Leonard that her brother should contact the police department.

Scott Leonard subsequently went to the police station for an interview. Leonard reported that during the early morning hours of November 30, 2007, plaintiff was driven home in a pick-up truck and contacted Leonard, his neighbor. Leonard reported that plaintiff looked distraught and upset and said he had killed someone that night by breaking the person's neck. Plaintiff reportedly told Leonard that the alleged victim was a pedophile who angered plaintiff by calling him a liar. Leonard stated that plaintiff was very emotional and "really convincing." Leonard further stated that plaintiff told him several people had to "pull him off" the alleged victim, and that plaintiff's friends would take care of the body. Leonard reported that he feared for his safety, because plaintiff asked whether he would have to kill Leonard, too.

Based on Leonard's statements, Officer Struble and others opened an investigation. Officers obtained information from

plaintiff's mobile phone provider and discovered that plaintiff had called a taxi service on the night of November 29, 2007. Upon questioning, the taxi driver reported that plaintiff mentioned to her that someone had "ratted" him out and he was going to "pay that person back."

Based on the statements of Leonard and the taxi driver, on December 1, 2007 officers obtained a search warrant in Benton County. Specifically, the search warrant authorized the search of plaintiff's residence to locate him and the clothing and backpack he was wearing on the night of November 29, 2007. The warrant also authorized officers to detain plaintiff "for the amount of time necessary to safely collect six (6) oral swabs as standards for future DNA comparison" and to search his person for "evidence of a struggle, weapons, blood, clothing with blood on it."[1] Corder Decl., Ex. 2. Plaintiff's whereabouts were unknown at the time.

Over the next two days, police officers spoke to several people, including plaintiff's landlord, employer, and several friends. Officers learned that on the evening of November 29, 2007, plaintiff had taken a taxi to Dana Sprague's apartment and drank alcohol there with Sprague, Brett Hinck, Christina Davis, and David Sitton.

Sprague was interviewed and reported that plaintiff had been

---

[1]After interviewing plaintiff's employer on December 2, 2007, officers obtained a similar search warrant in Linn County. Corder Decl., Ex. 5.

drinking when he arrived at her home on November 29, 2007, and that plaintiff became more intoxicated as the evening progressed. Sprague stated that plaintiff becomes loud when he drinks, and that he became agitated and argued with Sitton about mutual acquaintances and past events. At one point, plaintiff left her apartment and Sprague heard what she thought was plaintiff banging on a neighbor's door and a crash, as if plaintiff or someone else had fallen down the stairs. Plaintiff returned a short time later, and Sprague asked him to leave because of his behavior.

Sprague told officers that Brett Hinck then transported plaintiff home in Hinck's pickup truck. A short time later, at Sprague's behest, Christina Davis called Hinck to check on his welfare given plaintiff's intoxicated and agitated state. Sprague reported that Hinck returned to her residence shortly afterward and said that nothing had happened. Officers discovered small flecks of dried blood, measuring approximately one millimeter in size, in Sprague's bathroom.

Brett Hinck was also interviewed by police. He reported that he, plaintiff, Dana Sprague, David Sitton, and Christina Davis were drinking at Sprague's residence the evening of November 29, 2007. Hinck stated that plaintiff did not seem angry or upset, "just drunk," and that plaintiff was an "in-your-face type of drunk." Hinck reported that plaintiff might appear violent because he talks about fighting and drugs. Like Sprague, Hinck reported that

plaintiff and Sitton were talking about past events and mutual acquaintances.

Hinck stated that after plaintiff finished a bottle of whiskey, he stood up and said he wanted to fight someone. Hinck and Sitton declined to fight, and plaintiff said he needed some air and walked outside. Hinck stated that he heard plaintiff either stumble or fall down the stairs. Hinck then heard plaintiff mumble and begin pounding on a downstairs neighbor's door for several minutes. Hinck reported that when plaintiff returned to the residence, Sprague asked plaintiff to leave because he "was causing problems." Hinck agreed to give plaintiff a ride home. When they arrived at plaintiff's residence, plaintiff began what Hinck called "the drunken sobbing" and said he had no family other than his "uncle" who lived next to him - Scott Leonard. Hinck stated that it took approximately fifteen minutes to convince plaintiff to get out of his truck. As Hinck was leaving plaintiff's residence, Christina Davis called Hinck and asked if everything was okay. Hinck told Davis that he was fine and on his way back to Sprague's apartment. Hinck reported that Dana Sprague, David Sitton and Christina Davis were still at Sprague's apartment when he returned and remained there until morning.

Officers also interviewed Patricia Pitts, plaintiff's employer. Pitts reported that she directed plaintiff to return home on the morning of November 30, 2007, because he was still

drunk and unable to work.  In a subsequent interview, Pitts admitted that she had contacted plaintiff about the police investigation, because she believed plaintiff had "just gotten drunk" and told Leonard a "wild story."

On December 2, 2007, police made contact with plaintiff at a friend's house, detained and handcuffed him, and transported him to the police station.  Defendants assert that plaintiff was detained for purposes of executing the search warrant for his person, and that he voluntarily accompanied officers.  Plaintiff contends that his acquiescence was not voluntary, given the manner in which he was detained.  A search of plaintiff's person revealed no evidence, marks or injuries consistent with a recent struggle or assault.

During questioning, plaintiff reported that he took a taxi to Sprague's apartment on November 29, 2007.  Plaintiff stated that Sprague, a couple and another man (presumably Davis, Sitton, and Hinck) were present at Sprague's apartment, and that he talked about his past boxing matches and street fighting.  Plaintiff admitted that he drank large quantities of beer and whiskey that evening.  Plaintiff reported that after he "got drunk and mouthy" Sprague asked him to leave, and Hinck gave him a ride home.  Plaintiff reported that he remembered little after Hinck took him home, except that he went to Leonard's because he needed a "shoulder to cry on."

After further questioning about an alleged assault, plaintiff

6    - OPINION AND ORDER

stated that he was very drunk on November 29, 2007 and could not remember hurting anybody, but if he did, it was an "accident." Plaintiff also underwent a polygraph examination and was told that the results revealed he was concealing knowledge about the death of another person. The results of the polygraph examination were not shown to plaintiff.

Plaintiff was then formally arrested, jailed, and charged with manslaughter for the death of David Sitton. Police officers presumed Sitton to be plaintiff's victim, apparently because he was present at Sprague's house the evening of November 29, 2007, and he and plaintiff had reportedly argued. However, no witness reported and no physical evidence confirmed that Sitton was assaulted or injured, or that plaintiff and Sitton were involved in an altercation.

On December 4, 2007, Sitton called the Albany Police Department and stated that he was not dead. Plaintiff was not released from custody, however. Instead, an Amended Information was filed by the Linn County District Attorney's Office charging plaintiff with manslaughter for causing the death of "another unnamed human being."

On December 5, 2007, Sitton went to the Albany Police Department to establish that he was not the victim of a homicide.

On December 10, 2007, the charge against plaintiff were dismissed.

7    - OPINION AND ORDER

After the charge against plaintiff was dismissed, Albany police officers continued their investigation and obtained information regarding plaintiff's propensity to fabricate stories about harming or killing others. <u>See</u> Fairall Decl., Ex. 2.

Plaintiff alleges that as a result of his unlawful arrest and confinement, he lost his job and was evicted from his residence.

<u>STANDARD</u>

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).   The materiality of a fact is determined by the substantive law on the issue. <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).   The authenticity of a dispute is determined by whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. <u>Id.</u> at 324.

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. <u>T.W. Elec.</u>, 809 F.2d at 630.

<u>DISCUSSION</u>

As pled and construed, plaintiff alleges a claim of unlawful seizure under 42 U.S.C. § 1983 against several individual police officers, and a state law claim of false arrest against defendant Albany Police Department (Albany PD). Defendants argue that they cannot be held liable for plaintiff's Fourth Amendment claim and are entitled to qualified immunity, in light of their good faith reliance on the search warrants and prosecutorial advice, and the subsequent criminal information filed against plaintiff. Defendants also argue that plaintiff's false arrest claim must fail, because his arrest was supported by lawful authority.

<u>A.  Unlawful Seizure - 42 U.S.C. § 1983</u>

Individual defendants argue that, at minimum, they are protected by qualified immunity for any violation of plaintiff's constitutional rights. In deciding whether an official is entitled to qualified immunity, the court may first inquire whether "[t]aken in the light most favorable to the party asserting the injury, do the facts show the officer's conduct violated a constitutional

right?"  Saucier v. Katz, 533 U.S. 194, 201 (2001).  If so, the court considers whether the right was "clearly established" in the "specific context of the case."  Id.; Pearson v. Callahan, 129 S. Ct. 808, 818 (2009) (holding the Saucier two-step protocol is no longer mandatory, though recognizing "that it is often beneficial").  Thus, I first consider whether the facts support a violation of plaintiff's Fourth Amendment rights.

Although defendants emphasize the search warrants authorizing a search of plaintiff's person, it is unclear from the current record whether officers searched plaintiff when he initially was detained or whether they were required to transport plaintiff to the police station to execute the search of his person. Regardless, plaintiff contends and the police reports confirm that he was handcuffed and taken to the police station.  Plaintiff further asserts that he did not voluntarily accompany officers to the police station.  Construing all inferences and facts in his favor, plaintiff was arrested at his friend's house on December 2, 2007 and did not voluntarily accompany officers to the police station for questioning.

Further, again construing all reasonable inferences in favor of plaintiff, his arrest was not supported by probable cause. Probable cause exists if "under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant]

had committed a crime." <u>United States v. Carranza</u>, 289 F.3d 634, 640 (9th Cir. 2002) (quotations and citation omitted).

At the time plaintiff was arrested at his friend's home on December 2, 2007, officers had obtained numerous witness statements concerning the events of November 29, 2007. Reports of those witness interviews reveal that plaintiff's arrest was based on nothing more than drunken hearsay statements and questionable inferences of suspicious behavior. No physical evidence or witness statements recounted in the numerous police reports corroborate the tale heard by Scott Leonard; the police investigation revealed no witnesses to an assault, no physical evidence of an assault, and no victim of an assault. Notably, officers presumed Sitton to be the victim, despite the fact that no witness reported an altercation involving plaintiff and Sitton, and at least two witnesses reported Sitton to be alive and well after Hinck drove plaintiff home. Thus, I cannot find that a prudent or reasonable person would have concluded there was a "fair probability" that plaintiff had killed or even assaulted anyone. <u>Stoot v. City of Everett</u>, 582 F.3d 910, 918 (9th Cir. 2009) (information relied on by police officers making probable cause determinations must be "reasonably trustworthy"); <u>United States v. Del Vizo</u>, 918 F.2d 821, 825 (9th Cir. 1990) (accord).

The fact that search warrants issued does not alter my analysis, when the facts set forth in the supporting affidavits did

not give rise to probable cause. The first search warrant affidavit recounted Leonard's report of second-hand statements attributed to plaintiff and the taxi driver's statement that plaintiff intended to "pay back" someone who "ratted" on him, while the second added the interview with plaintiff's employer revealing only that plaintiff was "drunk" the night of November 29 and that plaintiff had been told of the police investigation. Corder Decl., Exs. 1, 4. Accordingly, I find that in the light most favorable to plaintiff, the facts establish a Fourth Amendment violation. Dubner v. City and County of San Francisco, 266 F.3d 959, 964 (9th Cir. 2001) ("A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification."); Caballero v. City of Concord, 956 F.2d 204, 206 (9th Cir. 1992).

The next question is whether defendants are entitled to qualified immunity despite the presumed Fourth Amendment violation. Groh v. Ramirez, 540 U.S. 551, 563 (2004). "The answer depends on whether the right that was transgressed was 'clearly established' - that is, 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Id. (quoting Saucier, 533 U.S. at 202). Defendants assert that qualified immunity is appropriate, because they acted in good faith and relied on the search warrants and advice of the district attorney's office.

12  - OPINION AND ORDER

As noted above, even though officers possessed warrants authorizing a search of plaintiff's person, the warrants did not authorize his arrest or continued detention and were not supported by probable cause. KRL v. Estate of Moore, 512 F.3d 1184, 1189-90 (9th Cir. 2008) ("When a warrant is so bereft of probable cause that official reliance is unreasonable, the officer executing the warrant cannot excuse his own default by pointing to the greater incompetence of the magistrate.") (citation omitted).

Moreover, prior to plaintiff's arrest, officers had obtained additional and remarkably similar witness statements that did not corroborate and in fact conflicted with Leonard's report. Given the paucity of evidence suggesting an attack or struggle and construing the facts in plaintiff's favor, a reasonable officer would have known that plaintiff's arrest was not supported by probable cause. Though defendants aver that they sought the advice of a deputy district attorney, the record does not include what information was provided to the deputy district attorney to allow the court to find that the officers acted reasonably or in good faith. Stevens v. Rose, 298 F.3d 880, 884-85 (9th Cir. 2002). Therefore, on the current record before the court, individual defendants are not entitled to qualified immunity.

Finally, defendants argue that they are entitled to summary judgment, because the criminal charge filed by the district attorney and the presumption of independent judgment immunizes them

from damages suffered after the charge was filed.  See Smiddy v. Varney, 665 F.2d 261, 266-67 (9th Cir. 1981) (Smiddy I); see also Beck v. City of Upland, 527 F.3d 853, 862 (9th Cir. 2008). However, the Smiddy I presumption may be rebutted in certain circumstances. Beck, 527 F.3d at 862 (citing Smiddy I and Awabdy v. City of Adelanto, 368 F.3d 1062, 1067 (9th Cir. 2004)); Blankenhorn v. City of Orange, 485 F.3d 463, 482 (9th Cir. 2007). Given the current record's lack of factual development and plaintiff's *pro se* status, I decline to apply Smiddy I presumption.

B.  False Arrest

Defendants also move for summary judgment against plaintiff's state law claim for false arrest. I again find that it remains a genuine issue of fact as to whether plaintiff's arguable arrest on December 2, 2007 was supported by probable cause and whether his continued confinement was lawful. Therefore, summary judgment is inappropriate.

C.  Appointment of Counsel

Finally, I reconsider my earlier denial of plaintiff's motion for appointment of counsel. Given the nature and substance of his allegations and his inability to pursue necessary discovery to develop an adequate record in this case, I hereby appoint Emilio Bandiero as *pro bono* counsel for all purposes. If Mr. Bandiero has a conflict of interest or cannot otherwise accept the appointment, he must seek to withdraw within 14 days.

14   - OPINION AND ORDER

CONCLUSION

Defendants' Motion for Summary Judgment (doc. 66) is DENIED and *pro bono* counsel is appointed for plaintiff as set forth above. IT IS SO ORDERED.

Dated this __14__ day of December, 2009.


_____/s/ Ann Aiken_____
Ann Aiken
Chief United States District Judges